UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **REDACTED TRANSCRIPT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:16-cr-00219-JMS-TAB |
| | ) | Indianapolis, Indiana |
| RICKY CLARK, | ) | Wednesday, February 6, 2019 |
| | ) | 9:43 o'clock a.m. |
| Defendant. | ) | |

Before the
HONORABLE CHIEF JUDGE JANE MAGNUS-STINSON

TRANSCRIPT OF SENTENCING HEARING

APPEARANCES:

FOR THE GOVERNMENT:     United States Attorney's Office
                        By:  Kristina M. Korobov
                        10 West Market Street, Suite 2100
                        Indianapolis, Indiana 46204

FOR THE DEFENDANT:      Indiana Federal Community Defenders
                        By:  Joseph Martin Cleary and
                        Gwendolyn M. Beitz
                        111 Monument Circle, Suite 3200
                        Indianapolis, Indiana 46204

ALSO PRESENT:           The Defendant in person.

COURT REPORTER:         Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 309
                        Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

1            *(In open court.)*

2            THE COURT:  We are here under Cause No. 1:16-cr-219.

3    This is the case of the United States v. Ricky Dean Clark.  He

4    is present in person with counsel, Ms. Beitz and Mr. Cleary.

5    The Government is present by Assistant United States Attorneys

6    Steve DeBrota and Kristina Korobov.  They are assisted by

7    Ginger Marshall with the Indiana State Police and Kurt Spivey

8    with IMPD.  Probation is here by Diane Asher, who is sitting

9    in for Greg Coomes, who prepared the report.  Our court

10   reporter is Jean Knepley.

11           Previously the Court accepted Mr. Clark's plea of guilty

12   to all counts, and this matter is before the Court for

13   sentencing.  I note there were changes to the presentence

14   report.  You can thank me for those, but it occurred to me

15   there should be more grouping than there was.  So that is what

16   prompted it.  We will hear argument on that if we need to.

17           I have also reviewed the letters of support in support of

18   Mr. Clark and the Government's sentencing memo.  The

19   Government's sentencing memorandum included review of —— or

20   provision of numerous discs.  The Court reviewed those

21   yesterday except for I couldn't get the disc with respect to

22   Count XXVII opened.  So I have not reviewed those photos.  So

23   who is taking the lead for Mr. Clark?

24           MS. BEITZ:  I will start, Your Honor.

25           THE COURT:  All right, thank you.  And have you and

1    Mr. Clark read and discussed the presentence report?

2         MS. BEITZ:  We have, Your Honor.

3         THE COURT:  I know you had an objection with respect

4    to paragraph –– I believe it was 80 ––

5         MS. BEITZ:  Eighty-four, Your Honor.

6         THE COURT:  Are there any other objections?

7         MS. BEITZ:  There is, Your Honor.

8         THE COURT:  Okay.

9         MS. BEITZ:  After the redistribution in the

10   grouping, we now extend that objection to include Paragraph 95

11   for the same reasons.

12        THE COURT:  Okay.

13       And that has to do with the number of images.  What is

14   the Government's response?

15        MS. KOROBOV:  Your Honor, we believe that that

16   calculation is correct to include the total offense conduct.

17   Additionally, we –– the Defendant distributed at least four

18   videos to Minor Victim 4, three videos during one of the

19   series and then, of course, distributed the images of his own

20   daughter, I believe –– Minor Victim 3 on a separate occasion.

21   So we believe that the calculation, though, that probation has

22   come up with is correct because it does include the total

23   offense conduct in what was possessed.

24        THE COURT:  All right.  So let me look at Guideline

25   2G2.2(b)(7)(D).  Certainly there were more than, in the total

1    offense conduct, there were more than seven videos involved.

2    So what is your argument?  What is the authority for your

3    argument that it is only limited to the particular count?

4            MS. BEITZ:  The words "if the offense involved."

5            THE COURT:  Okay.

6            MS. BEITZ:  It is specific to this offense of

7    distribution, and so if the Court were to look at what was

8    actually distributed in this offense, we have –– my

9    understanding was the one video that was distributed to Minor

10   Victim 2, and I am understanding now the Government to say in

11   another offense that would be three videos that were

12   distributed to Minor Victim 2.  And if you separate them out,

13   we believe that that changes the overall guideline.

14        Specifically, it will take a count of Group 4 down to 40,

15   which makes it .5 units; Count Group 5 down to 38, which would

16   take it to zero units, which would end up resulting in an

17   overall unit of a number of four, increased offense level of

18   four, combined adjusted offense level, 51; Chapter 4

19   enhancement, 56, and an overall end result of 53.  However, as

20   is noted at Paragraph 196, the highest offense level is 43 so

21   it would still remain a 43.

22           THE COURT:  Okay.

23           MS. BEITZ:  But appropriately calculated, the

24   defense believes it should be an offense level of 53.

25           THE COURT:  So what is Government's authority for

1    the fact the guideline does say "if the offense involved"?

2    What is the Government's authority for the —— I know this is

3    probation's position was we look at total offense conduct.  So

4    what is the authority for that?

5              MS. KOROBOV:  What is the count group, the group

6    that you are saying would be reduced?  I am sorry, if I could

7    ——

8              THE COURT:  Four.

9              MS. BEITZ:  Four and five, Your Honor.

10             THE COURT:  Four and five, right.  Those two

11   paragraphs are within those two groups.

12             MS. KOROBOV:  Because it incorporates the

13   possession, though, in those groups as well.  We believe we

14   are talking about the total offense conduct involved, and

15   because of that, we believe that the correct calculation is to

16   include all of the material that the Defendant possessed.

17             MS. BEITZ:  Your Honor, we ——

18             MS. KOROBOV:  To be honest, doesn't, in the end

19   scheme, does not matter because of the calculation so...

20             THE COURT:  Well, these aren't related to the

21   possession charges.  These are related to the distribution

22   charges, and I think we could, there could be an argument

23   made.  I am going to just in one minute ask Ms. Asher to weigh

24   in on this in terms of total offense conduct from probation.

25   It does say "the offense," and the offense —— it is one

1    incident on each day that involved the distribution on each of

2    those days.

3            MS. KOROBOV:  I am trying to –– which, okay.  For

4    Count VIII, we are looking at that distribution.  I

5    believe –– I believe that is one of the effective counts by

6    the group.

7            THE COURT:  It is.

8            MS. KOROBOV:  That video is 43-minutes long.  So

9    even though there are three, at least three videos that get

10   shared during that, one of them is a compilation of multiple

11   videos.

12           THE COURT:  Right.

13           MS. KOROBOV:  And there are easily more than 600

14   images alone in what is shared in that computation, and the

15   Court does have that video and does have the ability to review

16   it again ––

17           THE COURT:  I did review it.

18           MS. KOROBOV:  –– if needed, but I believe that, for

19   Count VIII alone, that would incorporate more than 600 images

20   for what was shared in a period of 43 minutes, that he live

21   streamed child pornography to that child.  And then with

22   respect, though, to the Count X, which is where he shares the

23   video of Minor Victim 3 with Minor Victim 2, I believe that is

24   the only video that is shared on that occasion.

25           THE COURT:  Okay.  So what I will do, then, is I am

1    going to —— having reviewed the videos that are associated

2    with Group 4, and there are multiple.  And there is, with

3    respect to the pornography related to a child other than Minor

4    Victim 3, and it may be more than one child.  I couldn't

5    really tell.  I think it might well be more than one child.

6    There was vaginal intercourse, anal intercourse with that

7    child —— with children, small, small children, and then the

8    video with Minor Victim 3.

9          So I will overrule it with respect to Group 5 and

10   leave —— and that would be Paragraph 95, but with respect to

11   Paragraph 84, I will sustain the objection.  And that would

12   mean we lower it to three levels instead of four —— five,

13   three levels instead of five at Paragraph 84, reducing that to

14   a 43.  Forty-three still gets one point, correct?

15               MS. KOROBOV:  Yes.

16               THE COURT:  Yes.  So I don't think it changes the

17   ultimate calculation.

18         Are there any other objections to the presentence report,

19   Ms. Beitz?

20               MS. BEITZ:  No, Your Honor.

21               THE COURT:  Are there any other objections for the

22   Government?

23               MS. KOROBOV:  No, Your Honor.

24               THE COURT:  There is a reference in the presentence

25   report to Minor Victim 4.  Is that Minor Victim 2's brother?

1          MS. KOROBOV:  It is, Your Honor.

2          THE COURT:  Minor Victim 2's brother was referenced

3     in one of the audiotapes.

4          MS. KOROBOV:  Yes, Your Honor.

5          THE COURT:  Let's see, associated with Count XXVI.

6          MS. KOROBOV:  Yes.

7          THE COURT:  And that tape references contact between

8     Minor Victim 2 and Minor Victim 4.  Do you have evidence of

9     that?

10         MS. KOROBOV:  Yes, Your Honor.

11         THE COURT:  I guess I will hear about that later.

12    All right.

13         There was another question I had.  Oh, all right.  So are

14    there any corrections or additions to the presentence report

15    for the Government?

16         MS. KOROBOV:  No, Your Honor.

17         THE COURT:  Okay.

18         And you have reviewed this, Mr. Clark, this report?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Do you have any corrections or additions

21    to it?

22         THE DEFENDANT:  No.

23         THE COURT:  All right.  The Court will accept the

24    presentence report, then, as its findings of fact in the case,

25    and we will accept the report, for the record, under seal.  In

1    the event of any appeal, counsel will have access to the

2    sealed report but not to the recommendation portion, which

3    shall remain confidential.

4        So we have resolved that one objection with respect to

5    the guidelines, and this is probably the most complex

6    guideline calculation I have ever been associated with.  So I

7    know that there has been careful review by the parties and by

8    the Court before today.  I can review each of the pages if the

9    parties would like me to do that for the record, or if you

10   agree that with the adjustments that we just made to, it would

11   be to Paragraph 84, the Court otherwise finds -- then there

12   would be, accordingly, an adjustment to 88.

13       The Court finds the guideline calculation to be correct.

14   It results in an aggregate guideline calculation, and I have

15   been educated that when a case like this is involved and there

16   are this many counts and then the groupings and then the units

17   being added, that the resulting guideline range for each count

18   in the case becomes life based on the calculation contained in

19   the presentence report.  And that is what probation has

20   indicated in the report.

21       Is there any objection to that conclusion — again, it is

22   advisory.  It is not mandatory.  Is there any objection to

23   that conclusion in the report, Ms. Korobov?

24            MS. KOROBOV:  No, Your Honor.

25            THE COURT:  Ms. Beitz?

1        MS. BEITZ:  And if I understood the Court correctly,

2   I just want to be clear, that the overall guideline would be

3   life.  However, you mentioned for each count, which would not

4   be possible because there are some counts which the statutory

5   maximum is —

6        THE COURT:  You are exactly right.  So for any count

7   for which the statutory — for any count for which the

8   statutory maximum is less than life, I misspoke.  So for any

9   count where the statutory maximum is less than life, the

10  statutory maximum becomes the guideline based on this

11  calculation.  For any statute to a maximum that includes life,

12  the guideline is life; is that correct?

13       MS. BEITZ:  We agree, Your Honor.

14       THE COURT:  And the Government agrees?

15       MS. KOROBOV:  Yes, Your Honor.

16       THE COURT:  All right, thank you.

17  So the conclusion, then, of the Court with respect to

18  each of the counts is as follows:  With respect to Counts I,

19  II, and XX through XXV, the guideline range is 240 months.

20  With respect to Counts III through VI and XXVI, the guideline

21  range, I don't think — yeah, is life.  With respect to Counts

22  VII through XIX and XXVII, the guideline range is 360 months.

23  Any objection to that calculation?

24       MS. KOROBOV:  No, Your Honor.

25       MS. BEITZ:  No, Your Honor.

1          THE COURT:  Thank you.

2      Also under the guidelines, the term of supervised release

3  is five years to life.  The fine is 50,000 to $500,000.  The

4  mandatory special assessment is $2,700.  The JT — JVTA

5  assessment on Counts I through XXVII would be $135,000.

6      Any objection to those — again, these are guideline

7  provisions.  Any objection to those guideline calculations,

8  Ms. Korobov?

9          MS. KOROBOV:  No, Your Honor.

10          THE COURT:  And Ms. Beitz?

11          MS. BEITZ:  No, Your Honor.

12          THE COURT:  I know that we have individuals with us

13  by video link.  Is that — do we know that it is working?  It

14  is not working?

15          MS. KOROBOV:  They haven't called in.

16          THE COURT:  Okay.

17      Who are they going to call, us?

18          MR. KALLASSY:  Yes.

19          THE COURT:  I know arrangements had been made with

20  IT for days now, I think, multiple arrangements.  Has the

21  Government heard anything concerning efforts?  No?

22          MS. KOROBOV:  We haven't.  We have attempted to

23  call.  Sometimes the time difference even could be causing a

24  problem, but we are fine to proceed.

25          THE COURT:  All right.  Thank you.

1    All right.  So the Court has concluded the guideline

2  calculation.  Is there any request for a departure -- not a

3  variance, but a departure.  It is not a trick question.  I am

4  asking for the record.

5         MS. BEITZ:  No, Your Honor.

6         THE COURT:  Okay.

7    Mr. Clark, you have the right, sir, to make a statement,

8  and if you wish to make a statement, now would be the

9  appropriate time.  You are not required to, however.

10         THE DEFENDANT:  Yes, Your Honor.  Thank you.  Please

11  bear with me.

12    I believe due to the futile inability to change my dark

13  past, no matter how much I regret it and wish I could, it

14  gives me greater inspiration, reason to do my best to

15  establish a better and brighter future.

16    I have, for nearly three years, been contemplating my

17  actions and what brought me to the point that I caused harm to

18  so many families and loved ones.  I can't even begin to fathom

19  or define the level of contempt that I feel for myself.  I

20  feel shameful and disgraceful for what I have done to so many,

21  whether it was downloading illegal child pornography, touching

22  a sleeping child, or violating the innocence of a girl online.

23  I know there is nothing I can truly say that will earn me

24  forgiveness of them or their loved ones because I can't even

25  forgive myself.

1    It will take time for me to begin the healing process.

2    It will take time and God and reading the Bible and counseling

3    with many chaplains.  I have learned and understand how what I

4    did caused more than God righteous anger.  I believe the Bible

5    teaches that children are to be protected, cherished, and

6    loved and not to be taken advantage of like I did.

7    I broke trust with the victims' parents who never thought

8    I would violate their children.  I instilled hatred and

9    betrayal in them.  I hope they know this is all my fault and

10   that they don't blame themselves.  Even the crimes I did

11   online took my victims' feelings of safety away from them.

12   Even though I wasn't there in person, I hurt her.  I took

13   her initial confidence and securities and her friendship and

14   twisted it into something unspeakable.  Even though I honestly

15   wanted to help her, I ended up taking advantage of her trust

16   and loyalty and innocence and hurt her in ways that in her

17   young life, she should never have imagined or let alone

18   experienced.

19   I know I scarred her deeply, psychologically, and

20   emotionally.  I want her and her loved ones to know this was

21   my fault and not hers.  I hope she and her family can heal one

22   day, that I didn't completely ruin her life and childhood.

23   In the beginning, my online postings, I know I was

24   helping others through my poetry and stories, comments, and

25   messages.  It is important for me to tell you that not all of

1   my online communications were bad or evil or done with devious

2   intent.  I had conversations with people whose — who said

3   they were being self-destructive in many ways.  I do know I

4   helped many of them.

5        I know God sees the totality of what I done online.  It

6   was not all perverted, but in the end, I know I am not the

7   hero of the story.  In fact, I am a villain.  I know with true

8   repentance and faith, my soul can still be saved.  I pray for

9   this forgiveness every day.  I also pray for the forgiveness

10  of those I have violated, whether it be the young, innocent

11  girls and their families, even though I know I don't deserve

12  their forgiveness because I haven't begun to forgive myself

13  yet.

14       But from the bottom of my heart, I am truly sorry to all

15  of my innocent victims and their entire families.  I hope

16  today brings some comfort and closure to them, knowing that I

17  will likely spend the remainder of my life in federal custody

18  and that even if I was ever able to get out of prison, I would

19  be closely monitored for life.

20       I have been — I have now been incarcerated since

21  June 2016.  My case became federal September 2016.  For the

22  last two and a half years I have been held in extremely

23  crowded and stressful conditions.  I did my best to be

24  respectful and honorable, never starting fights, bullying, or

25  stealing from anyone like so many in jails and prisons do.

I have used the time to work on some of my issues in life.  Every year I had a resolution I focused on.  In 2017 I focused on my mind, body, and soul.  I even wrote a poem about my resolution as part of a contest in Henderson.  To improve my mind, I started reaching out to my loved ones and working to reconcile our differences.  So I did not go through this alone.

I have appreciated my loyal and nonjudgmental family and friends, especially as I learned of some who disowned me.  I have also dedicated my mind to preparing for my GED.  I am proud to say that I earned it since being incarcerated.  I worked very hard at studying and completed it faster than I thought I could.  School was never easy for me, and I was very proud that I completed the classes and passed the test in September 29th of 2017.

During this time, I also, for my body, resolved to stop being so lazy and started getting up and doing workouts and exercising; I could, in the small area available for me.

To my soul, I began to embark on a spiritual journey to grow closer to God and to find meaning in life beyond my horrendous past.  I started studying in the Bible, completed a 12-Step program for addictions, and began doing individual counseling with several of the chaplains at the jail.

The one-on-one spiritual counseling sessions made me examine myself and my actions in new ways and gave me more

hope and peace of mind.  I learned that God is wonderful and peace himself.  This gave me a chance to confide in someone and allowed me to get the weighty burdens of my past off my chest and mind and begin the healing process, but I am still a very long way from results that I seek.

The edifying, selfless chaplains I met at Henderson County Jail enlightened me so much.  I wrote special poems for their organization, the Good News Ministry, that may be on their site one day.  I gave it to Chaplain Noblett to do so if he chose.

I also, in 2018, I resolved to read the Bible cover to cover in six months.  I am proud to say that I did that.  I made this vow to God, and reading the entire Bible has been another step toward my recovery.  And due to the Lord and his Biblical inspiration, I wrote many poems, prayers, and songs. I also did many personal spiritual fastings to glorify and praise Jesus in my own way.

I also asked for a mental evaluation and wanted a chance to be tested so I could try to find the best way to explain myself and also to seek, find and seek help that I so desperately need.  I even told Detective Marshall that the day I was arrested.

For 2019, I feel resolved to put myself in the shoes and place of my innocent victims and devastated families.  This was the hardest resolution, by far.  The pain I caused thus

far, the pain I caused is hard to face, but I know I must move
on forward for Victims 1 and 3.  I imagine the feelings of
betrayal to their mothers, for trusting someone and allowing
me to get close enough to harm their children.

I pray each night that Victims 1 and 3 were never told
what happened.  If told, it was no more than necessary to
determine the extent of the damage that I caused.  I am
honestly appalled by the disturbed — I have honestly
appalled — I am sorry, I can't see.

I am honestly appalled and disturbed by the possibility
that they were subjected to the reality of what I have done.
I wanted them never to find out, and I never wanted them to
wake up to what I was doing.  I didn't and never would have
physically harmed them or any child in my care.  For Victim 2,
I imagine them.  I imagined the loss of feeling safe in their
own home because I hurt her whole family even though I was
never in their house.

I believe that this resolution will also help me in the
treatment while in prison.  I realize that my behavior and
actions were odious to have manipulated the trust of these
innocent little girls.  For that, I am beyond sorry and
ask — and accept my righteous punishment here today.

Looking into my future, I would like to go to Marion,
Illinois or Tucson.  I plan to get counseling in sex offender
rehabilitation classes.  I also plan to continue seeking

1  spiritual advice from chaplains wherever I go on a regular
2  basis.  I hope to work in a kitchen at a facility I go to.  I
3  would like to use my GED to get culinary arts training and
4  take college courses, if I can.  I see there are many places
5  that have that kind of training, and people will always need
6  to eat.
7      I also want to take some college courses to further my
8  interest in literature, poetry, and song writing.  I want to
9  be busy, keep myself — keep to myself and stay away from
10 trouble.  I know that this is something I have to commit to,
11 and I fully intend to do that.
12     I will also continue to read my Bible and lots of other
13 books I can get ahold of and stay away from bad influence, try
14 to find others like me into comics and role playing and other
15 general interests that are like mine.
16     I know that what I have done and pled guilty to is awful.
17 I know that you have to think about all that when you sentence
18 me.  I hope you also consider my apology and sorrow when you
19 make your decision.
20     My decisions and choices are why I am here, but my
21 immediate future is your decision, Your Honor, you have to
22 make.  I ask and beg that you show me some mercy because I
23 haven't forgiven myself yet, but I know if God almighty can
24 forgive the world of our sins through Jesus Christ's
25 sacrifice, I hope to one day, with rehabilitation, I can

1   forgive myself.  And I am also truly sorry to all that has had

2   to view the appalling images and videos on my devices.  I know

3   it is your job, but it doesn't make it any easier.

4        I know what I done was illegal and odious, but I never

5   intended to harm a child, ever.  Please take that into

6   consideration, Your Honor.  I am genuinely wholeheartedly

7   sorry for my crimes.  Thank you.

8             THE COURT:  Thank you.

9        Ms. Beitz?  Before you argue, does the Government have

10  any evidentiary presentation?

11            MS. KOROBOV:  We did have a proffer, Your Honor, and

12  additionally, the Court wants some evidence regarding the

13  molestation of Minor Victim 4 by Minor Victim 2, I can also

14  point the Court to what I would be referring to.

15            THE COURT:  I will let you go ahead and make that

16  proffer before argument.  I think it is more appropriate.

17  Thank you.

18            MS. KOROBOV:  Thank You.

19       Your Honor, if permitted, I will ask counsel if she would

20  agree.  She said she would agree to some things.  I want to

21  make sure she is in agreement with all.

22       The testimony of Ginger Marshall with the Indiana State

23  Police would be that this case originally started from a

24  series of three NCMEC tips, the National Center for Missing &

25  Exploited Children.  Two of those tips involved anonymous

1    submissions by individuals who said that the Defendant had

2    contacted them on line and had told them he was a pedophile

3    who was in possession of child pornography and that he had a

4    "sub daughter" so a submissive daughter.

5        And those tips were essentially unable to be followed up

6    on because of inadequate information to follow up, and it was

7    the third tip, then, involving conduct with Minor Victim 2

8    that led the investigation to really get started here.  That

9    investigation is completely separate from the investigation

10   that occurred in Ireland, and it began in April of 2016.

11       With respect to the identification of Minor Victim 1,

12   that child was a child who lived with the Defendant.  The

13   Defendant had a friend named ███████, who was dating the

14   mother of Minor Victim 1.  And for a period of time, the

15   Defendant was homeless, and so Minor Victim 1's mother allowed

16   the Defendant to live in their home.  And he had a bedroom in

17   the home, which was next to the bedroom of Minor Victim 1,

18   giving him easy access to her.

19       In the images, as the Court knows, there is a very

20   distinct pattern on the wall, some artwork that is up on the

21   wall, and the mother of Minor Victim 3 told police that this

22   was perhaps a child that he had lived with at some point in

23   time.  So the police went to the residence where the Defendant

24   had lived with Minor Victim 1, and they were able to see the

25   layout of the house and some of that same artwork on the wall.

1    And when the family of Minor Victim 1 returned from a

2    vacation, they made contact with Minor Victim 1 and showed the

3    setup that is contained in the OM...G video to the mother, and

4    she was able to make an identification of her child that way,

5    including by the artwork on the wall and the blanket that is

6    found in that video.

7        THE COURT:  How old was Minor Victim 1 on the date

8    of the video?

9        MS. KOROBOV:  I believe she was eight or nine years

10   old — eight years old at the time of the video.

11       THE COURT:  Okay.

12       MS. KOROBOV:  With respect to Minor Victim 3, after

13   we had portions of the Defendant's collection, myself and Sgt.

14   Barnes and I believe Trooper Marshall were going through the

15   very large collection when we noticed the images that appeared

16   to be darkened, and so we are thinking why would you save this

17   particular image in a collection of otherwise very clear

18   images?  And so when we clicked on those videos, that is when

19   we discovered the victimization of Minor Victim 3.

20     It was sometime after that, that we discovered that the

21   Defendant had sent the images of Minor Victim 3 to Minor

22   Victim 2.  And she was approximately 10 years old at the time

23   that that video was created of her.

24     We identify, and we believe that that victim is, in fact,

25   the Defendant's daughter because the video was created in his

1    bedroom, and some of the images of his bedroom and the

2    pictures that are up on the wall of his bedroom match his

3    bedroom.  We also know from conversations and interviews with

4    Minor Victim 3's mother that the weekends that these videos

5    were created, that November 21st was around Thanksgiving, and

6    the Defendant had visitation with his child that weekend.

7         Additionally, the Defendant refers to the child in the

8    video as his daughter, and also the Defendant makes a

9    reference in some of the Voxer typed messages that the mother

10   of his child found out what he was doing to Minor Victim 3 and

11   she terminated visitation with him in April of 2016.  He

12   reassured Minor Victim 2 that as long as he still had access

13   to Minor Victim 2, everything would be okay.

14        Additionally, I refer the Court to the criminal complaint

15   filed in this matter.  It is Document 3, and if the Court does

16   not have a copy of that readily accessible, I can tender it to

17   the Court as Exhibit 1.

18             THE COURT:  I am fine.

19             MS. KOROBOV:  Court has it?  I believe it is

20   Paragraph 16 where we reference the interview that occurred

21   with Minor Victim 1 -- excuse me, it is Paragraph 15, the

22   forensic interview of the Defendant's daughter on June 14th.

23   The children were interviewed at Susie's Place, and Minor

24   Victim 1 acknowledged that she had awoken to the Defendant

25   standing over her.

1    She said, "I think he touched me in the wrong area."  She

2    described sleeping in the same bed as Clark when he had slid

3    his hand down her pants and indicated on a body diagram that

4    Clark had touched her buttocks.  She is aware that touching

5    occurred, and the Court will note she was still wearing a

6    Pull-Up at age ten to sleep in.  Upon the Defendant's arrest,

7    her bed wetting stopped entirely, and that is the proffer I

8    make with respect to those victims.

9        With respect to the fact that Minor Victim 2 engaged in

10   sexual touching of Minor Victim 4, first I proffer the

11   testimony from Sgt. Barnes, who traveled with us to Ireland to

12   interview the victim's family there to obtain physical

13   evidence from Ireland.  The father acknowledged that Minor

14   Victim 1 had told him that she did, in fact, engage in sexual

15   --

16        THE COURT:  One or two?

17        MS. KOROBOV:  I apologize -- Minor Victim 2.  I

18   apologize.  Minor Victim 2 engaged in sexual touching with

19   Minor Victim 4.  Additionally, in the written Voxer messages

20   which were sent to, to and from the Defendant and Minor Victim

21   2, there are numerous admissions by Minor Victim 1 that she

22   had engaged --

23        THE COURT:  Two?

24        MS. KOROBOV:  -- Minor Victim 2 had engaged in

25   sexual touching with the child.  In fact, on March 23rd of

2016, she wrote:  "OMG, I can't stop crying.  I did the video
of my being naughty with child's name, Minor Victim 4, but
silly me thought I could do it on my camera and then put it on
Skype.  And now I am sad because I had to send it on Kik.  I
am so sorry, Dada."

Additionally, the Defendant said to her on a number of
occasions, put pressure on her to molest that child.  She told
him, "Yeah, but he is teething, so I don't want to molest
him," to which the Defendant responded, "He gonna be teething
for many months.  It could help take his mind off the pain.
It is a rare chance on our anniversary."  He tells her to,
quote, lick his baby cock and balls.  Take him to your room
and do it.

And then he tells her that she is making excuse after
excuse.  "I never get to see you play with him.  It is not
fair.  You don't try hard enough.  You actually think your mom
in a million years would suspect you are molesting your infant
brother?  I assure you she don't, but you are too paranoid,
kitten."

And then she says to him, "I don't want to get caught
licking my baby brother's cock and balls.  My whole family
will disown me.  They think I am an F-ing freak.  Sorry, I
don't want to get caught."

And these would be the references.  Additionally, I
believe she did leave a specific voice Voxer message for the

1   Defendant describing what it tasted like when she performed

2   oral sex on her brother, who at that time was still in

3   diapers.  So he would have been an infant or a toddler.

4          THE COURT:  Thank you.  Ms. Beitz, any objection to

5   that characterization or proffer?

6          MS. BEITZ:  No objection.  We have seen that

7   evidence and believe that the Government, if we proceeded to

8   trial, could prove those facts.

9          THE COURT:  Thank you.

10      All right.  Argument then, Ms. Beitz?

11         MS. BEITZ:  Your Honor, there is no question that

12  this is a tragic case.  You won't hear any dispute from the

13  defense in this case that Mr. Clark's conduct was anything

14  other than egregious.  His conduct interrupted childhoods.

15  His conduct devastated families, and it changed lives forever.

16      You will also not hear any dispute from the defense that

17  because of that conduct, Mr. Clark deserves severe punishment.

18  You will also not hear that we agree — but that we disagree

19  that that severe punishment should include significant jail

20  time.

21      The very difficult question before the Court today is how

22  much incarceration is enough?  How much incarceration is

23  enough to serve the purposes of justice in this case but not

24  too much to ensure that that sentence serves no other purpose

25  but vengeance.  And that is not going to be an easy balancing,

1    especially in a case involving the most innocent members of

2    our society.  But it is a balancing that must be done by

3    statute, and we ask the Court to do it in this case because

4    every individual that stands before the Court deserves to have

5    that balancing done.

6        No person is all good, and no person is all bad.  No

7    person should be summed up completely by the black and white

8    words on an indictment, and the same is true for Mr. Clark.

9    So what I say today, in urging the Court to do some balancing

10   is not meant in any way to minimize what he has done.  He

11   accepts full responsibility for that, and what I say is meant

12   in no disrespect to any of the victims in this case.

13       But it is important that every person standing before

14   this Court hear not just the bad things about himself but also

15   the good things.  Because I have learned in my years doing

16   this, that the words that are said to a Defendant and the

17   words that are said about a Defendant when standing in court

18   are things they remember and take with them as they leave.

19       They are the things that they remember at night when they

20   are closing their eyes and that help define them going

21   forward, and that is important.  Because even if Mr. Clark

22   isn't going to be going forward into a community outside of

23   the walls of the BOP, Mr. Clark will be going to a community

24   inside the walls of a BOP.

25       That community includes other inmates.  That community

1    includes correctional officers and staff, and the words that

2    we say here today need to give him some sense of hope so that

3    when he is there, he acts with a sense of hope and doesn't act

4    with a sense of hopelessness, which can put other individuals

5    who he is in contact with in a bad place.

6        Mr. Clark has shown that he has the capacity and the

7    desire for redemption.  In the time that he has been in

8    custody, he has embarked on a transformative, spiritual

9    journey, as well as a journey to improve himself and how he

10   can be in that community when he reaches the BOP.

11       The Court heard that during the time that he has been in

12   custody he has earned his GED.  School was never easy for him.

13   He told you that, and it is easy to understand that because in

14   the chaotic environment that he was raised in, he switched

15   schools nine times before he hit the end of fifth grade.

16   School was never easy for him, but when he hit federal

17   custody, he applied himself and he worked extremely hard to

18   earn that GED.  And that is something that is positive about

19   Mr. Clark.

20       Another thing that is positive about Mr. Clark is his

21   path towards remorse.  I believe that his statement to the

22   Court today was sincere, it was thorough, and it explained

23   from his heart how very sorry he is.  He has acknowledged the

24   pain he has caused and the pain he has caused not just to the

25   victims directly but to their families and to all of us who

1   have had to look at the videos, even though it was a part of

2   our job.  He recognizes that that is something that he should

3   be remorseful for, and he is.

4        That remorse has not been an easy path for him either.

5   The Court has heard about how he was raised, the environment

6   he was raised in, beyond chaotic.  It was abusive, it was

7   neglectful, and it put him in a very bad position and on a

8   very bad path.

9        His mother, who loved him, and you see a letter from her

10  that was presented, did the very best she could.  But she was

11  not in a position to do much for him, being an alcoholic and

12  choosing very bad people to bring into his life.  And because

13  of her alcoholism, she was in no position to support him

14  emotionally, and she was in no position to protect him

15  physically.

16       And because of those things, he, himself, became a victim

17  not once but twice; the second time for an extended period of

18  time.  And at his counseling he has told you he has come to

19  realize and believe that that environment and what happened to

20  him and his own victimization has played a role in how he has

21  viewed things up until this point, and that is something that

22  he is asking for continued counseling in, something he is

23  asking for mental health treatment for.  That speaks

24  positively about Mr. Clark.

25       Another very positive thing about Mr. Clark is his

1   decision to come into court and plead guilty.  The Court,

2   hearing the proffers, the Court seeing the videos, the Court

3   reading the criminal complaint can see how absolutely horrific

4   a trial would have been in this case.  It would have put

5   several children through a process that would have compounded

6   what has happened to them and compounded their trauma.

7        He made the decision despite knowing that he is facing

8   guidelines up to life to plead guilty and to save them from

9   having to go through that.  That speaks well of Mr. Clark.  He

10  also saved members of the community who didn't, wouldn't have

11  chosen to see this.  That isn't a part of their job to have to

12  come in and view these videos and hear from these victims.

13  His decision to plead guilty saved that from those people.

14  That speaks well of Mr. Clark.

15       I understand that we are up against an extremely high

16  guideline, life, and that is just for the coercion.  I

17  understand the Court also has to impose a certain term of

18  years, at least in some fashion for the production counts.

19  Those range 15 to 30.  I ask the Court to consider the

20  spectrum that you have to consider in determining what is

21  appropriate, what is enough time that he needs to spend

22  incarcerated?

23       This case is tragic.  This case has some very disturbing

24  facts, but this is not the absolute worst-of-the-worst cases,

25  unfortunately, that we see in our jobs.  This is not the worst

1   case I am sure this Court has seen, and while it is hard to

2   put in perspective where it falls on that spectrum, it does

3   not fall to the side of life.

4        Life is something that we impose for murder cases.  While

5   hard to explain and hard to, I think, think about, this was

6   not a murder case.  It falls below that spectrum of what we

7   would impose in a murder case.  I really struggled to

8   determine whether or not I was going to argue to the Court

9   other similar cases because every case has their own unique

10  spin.

11       Every case has their own unique set of facts, but there

12  is one case just here in my experience in the Southern

13  District of Indiana has always been in the forefront of my

14  mind when I think about where on the spectrum I am going to

15  ask the Court to impose punishment, and that is United States

16  v. Newton, and Mr. DeBrota was on that case as well.

17       Mr. Newton received 40 years.  Mr. Newton's case involved

18  facts that he and his partner purchased a child on the black

19  market in Russia with the intent to raise that child in the

20  culture of boy love, and that is exactly what they did.  And

21  they moved that child all over the world, transferring that

22  child from hand to hand, in Europe, in the United States, and

23  allowing that child to be involved in the production of one of

24  the largest collections of child pornography that I have seen.

25  Production wasn't just done by other individuals, there was an

1   entire collection of production reaching back all the way

2   until the point that he was, I believe, 18 months old.  After

3   they believed he would start to remember that he has been

4   abused by his two fathers, that is when they decided to start

5   letting others have access to him.

6        Those facts are egregious, horrific, and were deserving

7   of very serious punishment and the punishment that was

8   adjudged was 40 years.  Now, I know that the Government will

9   point out that there are some differences, but I think my

10  summary is a fair summary of what happened in that case.

11       That is why we are asking this Court to adjudge a

12  sentence of 35 years.  Considering Mr. Clark's age, that

13  sentence will be most of his life, but what that sentence

14  does, is it gives Mr. Clark hope.  It gives Mr. Clark some

15  hope that when he goes into the BOP, that he continues to

16  program, that he continues to move forward.

17       He knows he is going to spend the rest -- most of the

18  rest of his life in prison.  What he is asking for is the

19  Court to give him a sentence that allows him, as soon as

20  possible, to move down to a security level where he can take

21  the programming that he needs.  He cannot get to anything

22  below a U.S.P., Your Honor, unless he has a remaining time of

23  30 years left on his sentence.

24       You can't get to a low unless you have less than 20 years

25  remaining on your sentence.  If the Court were to adjudge a

1    sentence that I believe the Government will ask for of life,

2    that puts him in a scenario where he will be sent somewhere

3    for the purposes of warehousing because that designation alone

4    increases his security level to the point that they think he

5    is a potential danger because he is not going to have any

6    hope, and he will be placed in places like ADX.  And again,

7    while his -- while what he did was egregious, he does not need

8    to be in a place with the murderers, people pending death row,

9    and those who have continued to commit crimes while they are

10   in the BOP.

11        He has shown this Court that even in custody, with the

12   limited resources that were available to him at the time, he

13   took advantage of them, he worked them, he completed them.

14   Redemption is possible for Mr. Clark.  We ask the Court to

15   recognize that in giving him a sentence of 35 years because 35

16   years and over three decades is sufficient, but not greater

17   than necessary in this case.

18             THE COURT:  Thank you.  Ms. Korobov.

19             MS. KOROBOV:  Your Honor, does the Court wish to

20   hear a response on the Newton case because Mr. DeBrota tried

21   that case or dealt with that case, and I have not had any

22   dealing with it.

23             THE COURT:  I am pulling up the PSR on it just

24   to -- I wanted to see what his age was around the time of

25   sentencing, and it was 42.  I was just looking at that.  I am

1   familiar with the facts as described by Ms. Beitz concerning

2   the child, but I also know it was a negotiated resolution, I

3   believe, wasn't it?

4          MR. DeBROTA:  Absolutely.  The key there being very

5   extreme psychological harm to the victim.  We had to factor

6   in complete mental destruction of the victim if there was a

7   trial.  It was two married Defendants, Truong and Newton.  She

8   represented Mr. Newton.  Mr. Newton plead first, did not

9   decrypt the hard drive we needed decrypted.  Mr. Newton did

10  that –– Mr. Truong did that later.  So the amount of evidence

11  we had was at the particular time we accepted the 40–year plea

12  was different than we know now, fully understand the set of

13  facts.

14         That said, Mr. Newton is a terrible person, but that was

15  100 percent driven by the necessity to avoid having that ––

16  the boy was six or seven, have to go through the trial.  It

17  was the adopted son of both Defendants.

18         THE COURT:  Thank you.  All right.  Ms. Korobov.

19         MS. KOROBOV:  Thank you, Your Honor.

20     A car accident is tragic.  This case isn't about a

21  tragedy.  A tragedy, to me, strikes the term as something

22  unavoidable or an accident in some way, but this was a series

23  of repeated intentional choices to sexualize children long

24  before they could ever be ready.

25         I am not going to call the Defendant a monster or any of

those names because I think that, thinking of this in terms of
is he good or is he bad, detracts from the conduct and the
series of choices that the Defendant made every single day
that he engaged, in particular, with Minor Victim 2.

With respect to Minor Victim 2 alone, the Voxer messages
that we had between them which were recovered, by the way,
from Ireland, not from the Defendant's physical possession.
That evidence exists independently.  There were over 35,000
messages that were exchanged between two individuals over a
period of April 3rd of 2015 to April 12th of 2016.  That
amounts to 94 messages a day.  That includes the
video — excuse me, the voice messages that were sent, photos
that were sent by Minor Victim 1 to the Defendant —

THE COURT:  Two?

MS. KOROBOV:  — I am sorry, Minor Victim 2 to the
Defendant, as well as all of the texts that was sent in which
he repeatedly encouraged her to engage in sexual conduct with
him, with her brother, and to do things like write a diary
where she was supposed to detail all of the fantasies that she
had about him, and it was also for the purpose of encouraging
Minor Victim 2 to engage with another individual on the
Internet, a female, known as Spicey Sally, whose identity we
have never been able to fully vet.

When the Court is looking at how much incarceration is
enough to serve the purpose of justice, I am happy to address

1   that on the terms that counsel wants.  This isn't about

2   vengeance because quite frankly, vengeance would be allowing

3   the parents of these children to just beat him to death.  That

4   would make them feel better.  It would be quick, and that

5   might serve as some kind of deterrent, but that is what a

6   sentence of vengeance would be about.

7       We are not looking to judge the Defendant on the basis of

8   the words in the indictment but rather the basis of his own

9   words.  And there is a reason that I gave the Court the videos

10  in this case, and for me it has nothing to do with the images

11  or the specific acts that the Defendant caused this child to

12  perpetrate on herself for the purpose of his own sexual

13  pleasure.  It is what he said to her over and over again, and

14  having prosecuted molest cases for years, without any physical

15  evidence where I would bring a child into the courtroom and

16  ask a jury to believe that child based on the child's word,

17  one of the questions these kids always got asked was how long

18  did it last?

19      And I, I don't -- I don't think there is ever a child

20  that said, well, I looked at the clock, and here is when it

21  began, and here is when it ended.  But I do look at the videos

22  in this case and how long some of them lasted.  We didn't even

23  charge all of the videos in this case, but some of them were

24  52-minutes long, 28-minutes long.  Untitled 51.avi, which is

25  the basis for Count VIII, was 43-minutes long.

1       Some of these videos were just very, very lengthy.  A

2  video that we didn't charge, for instance, Untitled 94.avi,

3  was an hour and 34 seconds long.  Untitled 119.avi, which is

4  the basis for Count VI and Count XIII, 28-minutes long.  And

5  that is just a brief period of what it is that the Defendant

6  did to Minor Victim 2.

7              THE COURT:  Can I stop you for a minute?

8              MS. KOROBOV:  Yes, Your Honor.

9              THE COURT:  How did they initially get into contact

10  with each other?

11             MS. KOROBOV:  We believe that they met through an

12  app or a website, and we believe it was Wattpad.

13             THE COURT:  How is that spelled?

14             MS. KOROBOV:  W-A-T-T-P-A-D.

15             THE COURT:  Okay.

16             MS. KOROBOV:  That is a website, quite frankly,

17  schools recommend to children as a place where they can go,

18  and they can post poems or artwork or things like that, and

19  then other people can comment on them.  So it is a way for

20  kids to exchange ideas, and to some degree, I am glad that

21  Minor Victim 2's family is not present because I can represent

22  to the Court that her life had not been an easy one in the

23  sense that her father had entirely disappeared from her life.

24       And so we believe that Minor Victim 2 went onto some of

25  these websites to talk about feelings, and that is very common

1     for kids these days to do that and to try to find solace or

2     comfort.  But we do not know the exact genesis of how this

3     conversation started or what led to the point where in April

4     of 2015, the contact between these two was already highly

5     sexualized contact.

6        In this case, when we look to the 3553(a) factors, and I

7     will discuss some of them before going to the way the

8     guidelines get calculated and discussing the nature or the

9     history of the Defendant.  First of all, this is a Defendant

10    who did have a prior felony conviction, which is not something

11    that we frequently see in these cases.  He was a convicted

12    burglar and sentenced to ten years in the Department of

13    Corrections with, I believe, all of that time suspended to

14    probation.  Then the Defendant had two children around that

15    time.  We don't know when his victimization of Minor Victim 2

16    or Minor Victim 3 began.

17       As for the need for the sentence imposed to reflect the

18    seriousness of the offense, to promote respect for the law,

19    and to provide for just punishment of the offense, I will

20    address those when I address the videos and the images and

21    what was done here.  But when it comes to affording adequate

22    deterrence to criminal conduct and protecting the public from

23    further crimes of the Defendant, I do believe that it is

24    necessary to put him somewhere forever because these days the

25    BOP seems intent on teaching Defendants or giving them access

1    to the Internet and to computers and to giving them those

2    skills.  And I have no doubt that during the time if the

3    Defendant was placed in any place that had those, he would

4    gain continued computer knowledge, and this Defendant, at age

5    80, with a keyboard, is just as dangerous as any other

6    individual would be.

7        There is no indication that an individual who repeatedly

8    refers to himself as a pedophile, who says that he is sexually

9    attracted to children, who describes conduct in the way he

10   does would ever change, that that behavior would ever stop,

11   and the community will need protection from him forever so

12   that no matter what access he ever gets, that no child will

13   ever be exposed to him again.  And unfortunately, prison is

14   the only place that we can keep him from children.

15       As far as educational or vocational treatment, it seems

16   that the Defendant has made some advances while he is in

17   prison, advances that he was unwilling or unable to make on

18   the outside.  And so perhaps this is an individual who can

19   live a better life behind bars.

20       And when it comes to providing restitution to any of the

21   victims, we have not received any request for restitution.

22   And certainly the Defendant, if in a facility at some point

23   can be placed in a location where he could participate in

24   programs, great.  But that is in no way something that the

25   Government has requested, and we don't believe that a need to

1  financially mitigate harm would ever overcome the need to

2  permanently place the Defendant somewhere where he cannot

3  house children -- or harm children.

4      So when I look to the groupings of the offenses in this

5  case, I first look to the grouping of receipt and distribution

6  and possession of these images, and the harm of the receipt in

7  this case is substantial.  Because the harm of receiving not

8  only the images of Minor Victim 2 but also of other child

9  pornography from the Internet, it gave him permanent material,

10  and the Defendant always had in his possession this material

11  of Minor Victim 2, as well as you go back to the images of

12  Minor Victim 1 that he created back in 2013.

13      We have no idea who else received these images, and while

14  the defense may argue that we don't have any evidence that he

15  distributed it to anyone else, the reality is that we will

16  never know that because the Defendant's method of distribution

17  to Minor Victim 2 was to do that distribution over Skype, and

18  the only reason that we have evidence of that is because he

19  recorded using Camtasia or a cell phone those individual

20  images and those acts of distribution.

21      Quite frankly, I would be shocked if the Defendant had

22  never distributed the images of what it is he did to Minor

23  Victim 2 using Skype to other girls because he was essentially

24  distributing the identity and his sexualization of Minor

25  Victim 2, at least to this other individual, Spicey Sally, to

1   have those two engage in conduct with each other.

2        When he distributed child pornography, his commercial

3   child pornography became bait.  When he distributed those

4   images to Minor Victim 2, showing her what happened in other

5   videos, it was for the purpose of showing her what it is they

6   would ultimately do when the two of them had children

7   together.  And the Court looks at things that the Defendant

8   said, particularly I believe it is Untitled 51, telling the

9   victim —

10          THE COURT:  Tell me the count.  I don't have it

11   by —

12          MS. KOROBOV:  I am sorry, that is Count VIII.

13          THE COURT:  Okay.

14          MS. KOROBOV:  This is the one where he says, the

15   date is 9/27, and we are watching child pornography together.

16   He tells her to, "Look at her holding Dada's cock.  You can

17   tell she wants it."  He says things like, "That is a

18   7-year-old girl, tops, no puberty.  This is how I know our

19   daughter would be able to take me."

20        He tells her that, "This man in this video took his

21   daughter's virginity at a really young age.  Look at that

22   pretty little girl.  She is guiding her Dada's cock inside of

23   her."  The Defendant did this to normalize conduct with Minor

24   Victim 2 to show her that his happened to other kids.  "See,

25   you are not a freak.  You should keep doing this with me; and

41

1    more importantly, one day you should produce a child for me so

2    that we can do this."

3        Well, you might say that is fantasy.  She lived in

4    another country.  That was never going to happen.  In reading

5    these Voxer messages that the child exchanged with him, she

6    certainly believed it was going to happen.  She believed that

7    this was a forever relationship, and whether this was

8    something the Defendant was doing with her perhaps to embolden

9    himself to do it with other people or whether it was a hope

10   that he had that one day they would be together, that he would

11   be able to convince this child to run away somewhere where she

12   could get to him, I have no real idea.

13       Having made that trip, it seems impractical, but quite

14   frankly, stranger things have happened.  It is not even so

15   much what could have happened in the future, it is what did,

16   in fact, happen to this child.  He would direct her

17   repeatedly, again referring to the conduct in Count VIII,

18   directing her to take off her clothes, directing her to

19   position herself in a certain way, referring to her as "my

20   little preteen pedo-princess."  And then to, of course, show

21   her the image of himself molesting his own daughter to

22   normalize what it is they would ultimately do to their

23   children.

24       And when you talk about the harm of merely possessing

25   child pornography in this case, it shows how prolific his

1    interest was.  Looking at the criminal complaint, there were

2    thousands of images that this man had across a number of

3    different devices.

4        Count XXIII is the Acer laptop, and on that device the

5    Defendant had a folder called "rape and sexual torture," which

6    contained videos with titles like "faces of death, rape with a

7    stick, faces of death, vagina torture," and "faces of death,

8    woodland rape torture."  This is not an individual who merely

9    enjoyed images that showed the lascivious display of

10   children's genitals, it was a man who enjoyed the

11   dehumanization of children for his own sexual pleasure.

12       When it comes to the coercion or enticement counts, the

13   Government is asking for a life sentence on these.  The

14   Defendant may claim that he thought he was helping or

15   encouraging others from committing suicide, self-harm, or

16   self-destructive behaviors.  But rather than having a child

17   destroy herself, the Defendant became bent on destroying her.

18       In the different images, the things that the Defendant

19   directs this child to do, it is the verbalization of that

20   conduct that the Government finds beyond horrific.  It is not

21   the acts themselves.  In fact, in one, the Defendant tells the

22   child, "You will never be my girlfriend if you don't do this."

23   And this is referring to Count III and Count VII.

24       "Keep going.  I will not be your boyfriend until you come

25   for me, ever," referring to her as his "sexy little

1    pedo-princess."  This individual was coerced and enticed into
2    engaging in sex acts with him essentially online.  The Court
3    is well aware that during the conduct where the Defendant is
4    inducing her to engage in sexual conduct and has produced
5    sexual images of her, he is also masturbating in these videos,
6    making it more of a sim -- or a conjoined act rather than, I
7    am simply watching you do something.  It became something that
8    he directly participated in.

9         She was coerced into engaging in sexual contact with her
10   baby brother.  She was enticed into filming the conduct with
11   her baby brother.  She was enticed into distributing or
12   attempting to distribute the conduct with her baby brother.
13   She was enticed to communicate with at least one other sub
14   daughter.  She was enticed to receive child pornography.

15        She was enticed to view child pornography, and even
16   though she told the child interviewer, "Oh, I didn't look.  I
17   turned away from it."  It is very clear that the Defendant is
18   describing exactly what happened in the conduct, and there is
19   no way that she was not acutely aware of what it is was being
20   shown to her.

21        She was enticed to participate in sexually explicit chat.
22   She was enticed to look at other pornographic material so that
23   she could appropriately chat with the Defendant.  She was
24   enticed to write sexually explicit stories and to send those
25   to the Defendant.  This Defendant, through his coercion and

1   enticement, turned a child victim into a child molester, and
2   that conduct alone merits a life sentence.
3        When I look at the nature and circumstances of the
4   offense in this question, there is the hands-on offending.  In
5   fact, he molested his own daughter, and in chat, he comments
6   that he has been caught.  It was April of 2016 when the
7   Defendant said to Minor Victim 2, "When I need you the most,
8   you are not there.  ███████ found out I was messing with my
9   daughter.  I am not going to get my kids no more.  I am
10  heartbroken, but she is not turning me in, though, so don't
11  worry about that.  But everyone will wonder why the kids don't
12  stay with me anymore.  I am so sad.  I loved them so much, and
13  now they are gone."  Of course, as long as he has Minor
14  Victim 2, he comments that he will be fine.
15       So when counsel asks how much incarceration is enough,
16  you look at what he did to Minor Victim 2 and then what he did
17  to Minor Victim 1 in the fact that the mother caught him and
18  he continued his conduct.  Quite frankly, the only reason in
19  this case that the conduct stopped is that Minor Victim 2's
20  mother and uncle discovered what it is that had been
21  happening.
22            THE COURT:  How did that happen?
23            MS. KOROBOV:  That happened because they found what
24  was on her devices.  There is no question that there have been
25  previous occasions where they had seen some images of her, and

1   in fact, she reports that to the Defendant.  That at one point

2   the mother had seen a video she had made of herself

3   masturbating, and the mother thought, though, that she would

4   be embarrassed if she was confronted about it.  The mother

5   didn't know that she was sending those images somewhere else.

6   So we believe that it was kind of that series of events that

7   caused the parents -- the mother and the stepfather to become

8   more vigilant about what was happening.

9       Additionally, the parents had taken note that the child

10  was sleeping a lot because something I will make reference to

11  later is the Defendant repeatedly encouraged this child to get

12  up early.  So she was engaging in these sex acts with him

13  before school because of the time difference, and as a result,

14  she was sleeping during other hours.  And there had been

15  changes in her behavior that caused her mother and stepfather

16  to question what it is that had been going on.

17      This Defendant also molested a friend's daughter.  With

18  respect to Minor Victim 1, that is a family that offered him

19  shelter.  They didn't put him up in a garage or just give him

20  some money to go somewhere, they actually let him stay in

21  their home, and he molested their child.

22      He also had, like I said, had Minor Victim 2 molest

23  another child.  This is a child who was an infant or a

24  toddler, wore a diaper, and the child makes repeated

25  reference; that is, Minor Victim 2, to how much she loved her

brother and how much she loved caring for him.  And because of
that age difference between them, I think in many ways she saw
him as her own child, and I cannot imagine the guilt that she
feels now, knowing what it is she was induced to do to her own
sibling.

And when you think about what it is that the Defendant
has done to this family, this is a family that now has to
engage in a certain amount of caution with respect to leaving
Minor Victim 2 alone with this child.  And I think, as well,
about all the normal things that girls do growing up, which
usually include careers in baby-sitting.

I am not even sure that the family of Minor Victim 2 has
an appreciation for the precautions that they need to take
with respect to this child.  We know that there has been
counseling.  We know that there has been Social Service
intervention, but I think that there is a very real risk that
will always exist with respect to this child.

The Defendant, in his own words, molested Minor Victim 2.
That is the language he used for what it is he did to her, and
for the Defendant to say, "Well, I was never in their house."
Oh, yes, he was.  He entered their home repeatedly on multiple
occasions a day through the Internet.  It is no different than
if he had crawled in the window and done these things to this
child.  He did it while her parents were home.  He kept her
awake or made her get up early, and then he had her

1    communicate with this other girl.

2         When I think about the breadth of the Defendant's

3    victimization of children in this case, he had told these

4    other women in the NCMEC tips that he had other sub daughters,

5    and we found links to females in other countries.  But because

6    of the anonymity of the Internet, we were never able to trace

7    those down.

8         You look at the duration of the Defendant's conduct, he

9    said that he had been doing this for four years.  The video

10   dating back to 2013 at the time that he was caught would have

11   only have been three years in duration.  So when the Defendant

12   admits in a Voxer chat that he has been doing this for four

13   years, we wonder how many other victims are there?  Who knows

14   how long he had been engaging in conduct with his own

15   daughter; and quite frankly, since he admits he was molesting

16   these children when they were asleep, we have no real way of

17   knowing what it is he did.

18        When you look at what he did to Minor Victim 2, she was a

19   secondary victim of the production on his own daughter; and

20   quite frankly, for a Defendant who claims, "I was just trying

21   to help her feel better about herself," I look at the way she

22   refers to herself.  "I am such a whore."  I, I don't know what

23   it is for a 12-year-old to think of herself that way or to say

24   that, "My family already thinks I am a freak.  What would they

25   think of me if they knew what I did?"

 1         And I think of what 12 is, and for me, 12 was wanting a
 2    Cabbage Patch doll.  Twelve was roller skating parties.
 3    Twelve was sticker collections and still getting dolls for
 4    Christmas.  Twelve was sixth grade, and the things that this
 5    child says to him and does with him goes so far beyond what
 6    any child should ever know.
 7         And I, I don't have any reason to believe that she came
 8    into it this way, and the reason I say that is because at
 9    times she says to him in these Voxer message things, "I don't
10    know what you are talking about," or "I don't know what to
11    say.  I am little."
12         The Defendant says to her at one point, "I am here, and I
13    am never leaving you.  You mine and my life, blood daughter.
14    Just play it cool.  You will have your phone in the morning."
15    And she says, "But I got scared today," talking about when her
16    mother had perhaps discovered what it is she was doing.  And
17    she says, "I won't be able to live without my Dada."  She
18    tells him that she deleted the apps so that her mother
19    wouldn't find out what she was doing.
20         At one point she said she is so scared about getting
21    caught with this that she hurt herself, to which the Defendant
22    responds that he is going to kill himself, knowing what it is
23    she did, and I think about the guilt that that would place on
24    this child that, "I told you I hurt myself because I was
25    afraid of losing you, and you threatened to kill yourself."

1   How selfish and awful is that to put this guilt on the child?

2        And then there is this forever concept that the Defendant

3   puts on her, and he is making plans with her to have her run

4   away at some point in the next year, and he tells her, though,

5   that, "She is going to have to stay gone, obviously until she

6   is 18 because any conduct before that would be a crime."  So

7   she believes and is starting to prepare herself for leaving

8   her family for a period of years.

9        She says at one point that she wants to spend time with a

10  particular family member because when I run away, I won't see

11  that person again, to which the Defendant responds, "Well,

12  don't worry.  You will see them again when you are 18."  She

13  talks about not being able to take a goddaughter after she is

14  confirmed because she knows she won't be there for that person

15  because she is going to run away for the Defendant.

16       The Defendant says to her at one point, "I just realized

17  I probably have more hours of my kitten's child porn than your

18  whole family has home videos of you.  He, he."

19       He encouraged her to break her parent's rules.  He says,

20  "I pray you are alone and I get my sound back to make the

21  hottest, sexiest child porn video, ever."  He tells the child,

22  "It is okay.  You can start resenting your mother as much as

23  you want.  It will make it easier when you run away.  Anything

24  that helps make it easier on you is what Dada wants.  Just

25  anything that makes it less or is the pain, like you, if you

run away, if you resent or she pisses you off, that helps you run away.  I want my kitten.  I don't care how I get you."

Then she says that, "I had a talk with my mom about how I feel, and I feel loved and stuff.  They are going to let me have my iPad back" because that is something they had taken from her, and he tells her what to say to her mother, that she needs to listen to music at night, mom.  That is why I should be able to have my iPad back.  He is feeding her lies to tell her mother so that she can continue her communication with him.

He tells her at one point, "You kept Dada a secret from your mom for almost a year now.  Quite impressive," and she says, "He, he, thanks."  He says, "Dada is so proud of you." She says, "Stop, you making me blushing," and we wonder why children who are victims of child abuse are called liars. Here is why.  Defendants teach them to lie.

This is about the complete destruction of this little girl's childhood.  She talks about the Easter bunny, being afraid of horror movies, and about monsters under the bed.  I am sure it was not lost on the Court that during many of these videos you can see the picture of a boy band up on the wall, essentially looking back at the Defendant as this child is videoed engaging in sex acts.

And if nothing else reminds the Defendant and would have been a reminder to him all the time, this was a little girl's

1   bedroom.  That is how her family saw her, and that is what she
2   was before the Defendant got to her.
3        She talks about school performances and going to dances,
4   and the Defendant says things to her like, "Well, when you go
5   to those dances, make sure, though, that no one touches you
6   except maybe if it is a girl because that might be okay.  And
7   that way we could have another daughter to participate in this
8   conduct with us."
9        And he tells her at one point as far as their plans to
10  run away, "Just think about it.  This time next year you won't
11  be going anywhere without me," and that is sent to her on
12  March 24th of 2016.
13       He constantly makes her feel guilty about not
14  communicating with her -- with him.  If she doesn't respond to
15  one of his messages in time, he is asking where she is.  "I am
16  worrying about you," and this causes her to respond, "Of
17  course.  Are you angry with me?"  And it starts this back and
18  forth about how, "No, nothing could make me happier than
19  contact with you.  Just promise you won't lose that contact
20  with me."  And quite frankly, he has made her complicit in the
21  conduct, and this is where it is different than a child who
22  has been forcibly sexually assaulted.
23       In many of those cases while the child may believe that
24  they did something or they said something, they know that they
25  resisted or they did things to resist the conduct.  And in

1  this case, the Defendant has made her complicit in the

2  behavior, asking her for things like wanting to watch her

3  urinate.  During all the videos he pushes a submissive

4  relationship and had her engage in some kind of contractual

5  relationship with him where she agreed to do things like be

6  willing to be daddy's child porn star and to shave her vagina

7  every time you shower.

8      He put her in contact with this Spicey Sally.  He told

9  her that "she was mine."  And when he said he was a perv, he

10  admitted it was on an ethics scale, a pedo scale.  We have

11  talked about the fact that he was keeping this child awake and

12  the constant pressure that he put on her, telling her, "I live

13  to love you" and would ask her repeatedly to make videos.

14      And then, when she said she would try to do it on one

15  occasion, that she was busy, she had other things going on, he

16  said, "You no try.  You do it."  He told her to be here at a

17  specific time and that he would want to see her at that time,

18  and when she would read messages and he could see a receipt

19  that she had received the messages but wouldn't reply, he told

20  her, "It scares Dada so much."

21      There is no question that this Defendant knew the conduct

22  was illegal.  He said he would do all kinds of nasty, naughty,

23  illegal perversions with your pedophile Dada.  And that was in

24  September of 2015.  He has all along knew that this conduct

25  was illegal, and in fact, at one point she makes a comment to

1   him, like, "Well, you don't even introduce me to your family.

2   Are you embarrassed about me?"

3       He was like, "Well, how do I tell them, 'hi, come meet my

4   12-year-old girlfriend.'"  He not only knew her exact age, but

5   he knew that it was wrong.  And then there was the constant

6   stream throughout these messages of telling her to delete

7   apps, which the Government believes is destructive conduct.

8       It was in April of 2016 that the Defendant said, "I live

9   to love you, kitten.  You have to be careful.  You never know

10  if a cop is undercover.  There is a reason I make Master Daddy

11  and meet girls there first.  Don't say I am being paranoid

12  because I have done this for over three years now, like,

13  almost four."

14      Quite frankly, I could go on and on about the depravity

15  of this conduct, but the Court has experienced it firsthand.

16  And that is why I gave the Court the videos because the things

17  that he says to her are what the Government finds the most

18  egregious, and that is why we are asking for the life

19  sentence.

20      In this particular case, with respect to the counts, I am

21  asking for life on each of the coercion or enticement counts.

22  Then going to Count VII, I am asking for 30 years on that

23  count.

24      I am asking for 30 years on Count VIII, which is where he

25  has her watch child pornography with him.

54

1    I am asking for 30 years on Count IX, which is where he

2    produces the images of her engaged in sexually explicit

3    conduct -- or excuse me, that is with respect to Child

4    Victim 3.

5    I am asking for 30 years on Count X, which is where he

6    shows her the video of Child Victim 3.

7    I am asking for 25 years on Count XI, as that video is

8    only 12-minutes long.  I do believe there may be some

9    differentiation here.

10   I am asking for 30 years on Count XII.  That is a

11   30-minute video during which he made this child engage in

12   sexually explicit conduct.

13   I am asking for 30 years on Count XIII, which is a

14   28-minute video.

15   I am asking for 20 years on Count XIV, which was only a

16   three-minute video.  I use the term "only," in context.

17   With respect to Counts XV through XVIII, those are all

18   production on his own daughter.  The Government is asking for

19   30 years on each of those counts because of the terrible abuse

20   of the position of trust and the fact that this child was, in

21   fact, aware that her father was sexually engaging with her.

22   With respect to Count XIX, I am asking for 30 years, as

23   that is the conduct with respect to Child Victim 1, again, the

24   terrible breach of trust that occurred in that case and the

25   fact that that family opened their home to him and the

55

1    8-year-old status of that child.

2         With respect to Counts XXVI and XXVII, I am asking for

3    life imposition on Count XXVI, and I am asking the Court to

4    make that specific finding because that is evidence that

5    exists independent of any investigation in the United States.

6    And in the event that there were ever to be some finding on

7    suppression, which the Defendant is allowed to appeal in this

8    case, that is a count that would stand completely independent.

9    That evidence comes solely from Ireland.

10        And we are asking for 30 years on Count XXVII, which are

11   the images that Child Victim 2 sent to the Defendant through

12   the Internet that were still, again, found in her possession;

13   and so again, existed completely independently.

14        This case isn't about a tragedy, Your Honor.  It isn't

15   about an accident, and it isn't about giving someone hope

16   because I can only imagine how that child felt when they are

17   reached upon and the conduct is continuing to occur and

18   continuing to occur.  And she transitioned from being a

19   12-year-old little girl who liked boy bands and who was going

20   through a confirmation into a child who is wholly sexualized,

21   knows things and talks about things in a way that no

22   12-year-old should talk about; and in fact, that the Defendant

23   turned this child into a molester.

24        I would also ask that the Court give very limited weight

25   to the Defendant's, I guess, saving the children from a trial.

1    We would not have had to call a single one of the children in

2    this case because the evidence exists on video.  So the notion

3    that the children would have been spared a trial is not, in

4    fact, a savings.

5         Additionally, it took this Defendant over two years to

6    plead guilty.  He put the Government through a suppression.

7    He attempted to fire his lawyers and to back out of the plea.

8    In this case he physically fought the police when they came to

9    his house, and he attempted to destroy evidence.

10        He also repeatedly told the child in this case to destroy

11   evidence, and in this case, the Government — well, we did not

12   have the expense of a trial.  We did have to travel to Ireland

13   to physically retrieve evidence and to prep witnesses in

14   anticipation of a trial here, and quite frankly, we questioned

15   how this could not be some of the worst of the worst.

16        Well, we do sometimes impose life for murder.  I think

17   that in some ways Minor Victim 2 is dead.  The child that she

18   was, before the Defendant entered her bedroom and entered her

19   body and caused her to molest her own brother, that child is

20   gone, and the parents are now left to deal with the shell of

21   the child that they have left and to attempt to raise her in a

22   way that will hopefully give her the best opportunity at a

23   normal life, or at the very least, at a life that is free from

24   continued sexual abuse or perhaps even the sexual abuse of

25   others.  Thank you.

1        THE COURT:  Thank you.  I am going to take a brief

2   recess to go over --

3        MS. BEITZ:  Your Honor, may I be heard in response

4   very briefly?

5        THE COURT:  Yes, yes.

6        MS. BEITZ:  I want to just make one point, and that

7   is the point that the Government has asked the Court to put

8   little weight on the fact that you didn't have to go to trial,

9   that we all didn't have to go to trial.

10        THE COURT:  I heard her say that the victims didn't

11   have to testify versus going to trial, but go ahead.

12        MS. BEITZ:  You are correct, Your Honor.  I

13   apologize.

14        THE COURT:  Okay.

15        MS. BEITZ:  The sentence that you hand down today,

16   it certainly is something that is going to send a message to

17   Mr. Clark.  But it is also going to send a message throughout

18   the defense community and the advice that we might give to

19   other clients and the clients themselves when they hear what

20   kind of a sentence you get when you plead guilty.  That even

21   though he pled guilty, accepted responsibility, and, and even

22   in the event the children did not have to testify, those

23   images of them would have been displayed in the public forum.

24   That would have been devastating.  That would have compounded

25   harm.  This guilty plea prevented that.

1      And so if the message that the Court sends is even if you

2   plead guilty, you are going to get life, what incentive does

3   that have to others to take responsibility, to plead guilty,

4   and to prevent a trial?  And we would argue to the Court that

5   it prevents none.  That decision is an important decision, and

6   it does speak well to Mr. Clark and it matters and we ask the

7   Court to consider that.

8          THE COURT:  All right, thank you.  We will be in

9   recess.

10         THE CLERK:  All rise.

11      (Recess taken from 11:10 - 11:34 a.m.)

12                         AFTER RECESS

13         THE COURT:  We are back on the record in the United

14   States v. Ricky Clark.  I have a question concerning

15   restitution in this case.  We haven't heard any discussion of

16   that other than — is there any request for restitution?

17         MS. KOROBOV:  Your Honor, we have not received back

18   a report from NCMEC, the National Center for Missing and

19   Exploited Children as to identification, and usually to be

20   honest with the Court, what I do when there is a case,

21   depending on the sentence, I just tell the families this is

22   what the sentence is.  If you still want to submit a request,

23   fine.  Usually when the number is a certain number, I don't

24   get requests.  I will still be waiting to hear from them.

25         THE COURT:  Thank you.  All right.

1    They do have some time under the statute.  Oh, we are

2    losing somebody.  Okay.

3    All right.  So the Court is evaluating this case under

4    the 3553(a) factors, and we will start with the first factor,

5    the nature and circumstances of the offense and the history

6    and characteristics of the Defendant.  I will do those in

7    reverse order.

8    With respect to the history and characteristics of the

9    Defendant, I find and accept in mitigation the Defendant's

10   abuse of a neglectful childhood, the fact of being abused as a

11   child.  His post-incarceration efforts, I have written in my

12   notes before Ms. Beitz said this word, he has begun a journey,

13   and he has begun a journey of spiritual renewal and

14   self-improvement, including getting his GED.  And I, I find

15   all those factors in mitigation.

16   Then, looking at the nature and circumstances of the

17   offense, the Court finds, as argued by the Government, the

18   fact that the Defendant was in a position of trust with

19   respect to Minor Victims 1 and 3, and in the Court's view,

20   ultimately with respect to Minor Victim 2 with whom he

21   established this relationship and this dependency, the Court

22   finds egregious, the coercion and enticement.

23   You can watch her behavior change over the course of time

24   in the videos how she responds to him, her initial reticence,

25   and some of the coercion that he is using or accusing her of

1    regressing.  This is from the Count III video telling her he

2    is close to making her his girlfriend, but she needs to do the

3    diary, and she needs to shave.

4         Also, the fact that as the Government noted, he

5    encouraged the molestation of her small toddler brother.  And

6    then just some of the other facts that were included in his

7    own admissions on some of the videos from the one I just

8    talked about referred to in Count III where he is encouraging

9    her to imagine both of them molesting his daughter,

10   encouraging anal penetration.  You can see she is getting

11   frustrated covering her face, and then he comes back with the,

12   the technique of that, saying I am going to ask you to be my

13   girlfriend and the other thing she has to do.

14        His words, "I want to molest you."  The film that

15   is — that is in Paragraph 6, "Dadda wants to molest you" or

16   Count VI.

17        In Count IX, the fact that Victim 3 is his daughter, a

18   young child.  Some of the language that the Government

19   referred to in Count VIII, my preteen pedo princess watching

20   child porn together, instructing her to use a sucker,

21   instructing her on ways to place the camera, showing child

22   pornography with a very young child on a grown man, and then

23   make some comment that, "Oh, I guess he didn't use a condom."

24        Again, imagining the scene of both of them molesting the,

25   the other daughter.  The counts in paragraph — or Count XXVI

1  referring to her as her incest lover daughter, talking her, to

2  her about molesting her baby brother, saying that he loves

3  incest.  She must keep it secret.

4      And then, again, paragraph — or Count X.  I keep saying

5  paragraph.  Count X saying "action," making it clear that he

6  is making a movie.  In that one, I believe he is showing the,

7  the reference to the video involving his daughter discussing

8  his quote, "sissy's pussy, both my daughters' pussies."  This

9  is Count X.

10     Count XII, instructing her to strip, "get it full

11 screen," saying "action," engaging in some slapping behavior

12 and then saying that he wants her to shit in his mouth and

13 piss in his mouth, and that 90 percent of the child porn or

14 90 percent of what they do they will make into child porn.

15 And it is okay if he is shared with other little girls.  So

16 trying to get her groomed into dealing with sex acts involving

17 other children.

18     In Count IV, this is early May, May 5, 2015, where she is

19 topless with a skirt on, telling her not to be scared.  She

20 looks scared.  You can see she is reluctant, and he tells her,

21 "Don't be scared.  Hurry.  Don't be afraid."  And then the

22 other counts that relate to Minor Victim 3, the acts that he

23 performs on the child in Counts XV through XVIII.

24     Same with Count IX, the acts he performs on these small

25 children.  So that, that is, I think, an accurate

1    characterization of the, of the conduct he engages in to

2    discuss the nature and circumstances.

3         The Court is particularly troubled with the conduct I

4    just outlined, and then the admissions of the Defendant

5    himself as to what his, his preferences are, the extent to

6    which he went to lure this child into this relationship and

7    the concern that I have that it is based on something that was

8    written by the Defendant that he thought he was just trying to

9    make somebody feel better who was in, in a bad emotional

10   place.

11        That is -- the damage that you caused, Mr. Clark, is

12   lifelong.  You are on a lifelong journey.  So will Minor

13   Victim 2 be on a lifelong journey because the devastation you

14   have done to her entire ability to trust or to engage in

15   reasonable, reasonable or normal sexual behavior is, is

16   probably lifelong.

17        So I, I bring that up because your attorney made the

18   argument that a life sentence should be saved for murder, and

19   this isn't a murder case.  Well, it is not a murder case, but

20   this child is going to live with the effects of your crime.

21   Her family is going to live with the effects of your crime.

22   Your daughter is, to some extent, is going to live with the

23   effects of your crime, not to the extent Minor Victim 2 is,

24   but that is something she will have to live with for the rest

25   of her life.  And so too in the Court's mind, it makes this an

63

1   extremely serious offense.

2        Your self-described predilections make it a very serious

3   offense.  Your acknowledgment that all of this violates the

4   law, your attempts to sever Minor Victim 2s relationship with

5   her mother and disturb that relationship, also the damage that

6   you have done to her.

7        Deterrence is something I have to consider, but the most

8   important factor under 3553 that is weighing on the Court's

9   mind is that of protection of the public from further crimes,

10  and in this case, the public that we are trying to protect are

11  the most vulnerable victims, are the most vulnerable members

12  of society, and those are children.

13       Things like a biological relationship didn't deter you.

14  Things like kids being the children of your friends didn't

15  deter you.  It is the Court's view that no sentence other than

16  life will -- rest assured, that the children in our society

17  and even internationally will be safe from your actions.  I

18  feel as though, in this case, as much as any other that I have

19  dealt with, that is my responsibility.

20       I am mindful of the argument made by counsel that this

21  will get around the defense community and nobody will plead.

22  In terms of balancing that against protection of the public

23  and protection of children, I will weigh that and do the

24  balancing you asked me to do and find that protecting children

25  is my responsibility in the sentence in this case.

1    The Defendant also has, even in the probable harsh

2    circumstances of his current confinement, established that he

3    can make progress while incarcerated, and there will be

4    opportunities for him.  I am mindful that this sentence, which

5    will ultimately aggregate to life, will be one that may impact

6    his place of confinement, but that is a consequence of his

7    conduct.

8         To the extent that you were looking at Newton as a case

9    involving disparity, that was a negotiated resolution.  The

10   facts are in some ways worse than this case, since what they

11   did with that, buying that baby essentially in order to

12   perform acts.  But in some case, I have somebody here who not

13   only molests the child himself, he takes films of it, he

14   distributes it.  He does it of his own children, he does it of

15   friends' children, and he creates the devastation to Minor

16   Victim 2 that will impact her for the rest of her life.

17        So I think the sentences are disparate, but they are not

18   the exact same circumstances.  So I don't find that that

19   warrants a sentence other than what the guidelines and

20   ultimately the statutory maximums call for.  So I wanted to

21   just go through this.  He molested his own daughter.  He

22   filmed it, he sent it.  He molested his friend's daughter.  He

23   filmed it.  He enticed and coerced Minor Victim 2 into sexual

24   conduct on herself while he is engaging in masturbation.  He

25   filmed that.  He encouraged her to molest her baby brother,

1    and in a very real way, he molested her.

2         The Government pointed out some statements that she has

3    made about the damage to her.  "I am such a whore.  My family

4    already thinks I am a freak."  So I think we have got evidence

5    of the damage caused to her.

6         So the sentences I will go through by count in just a

7    moment, but ultimately the notion of protection of the public

8    and deterrence, warrant the Court to find that on the

9    appropriate counts, life is an appropriate sentence.  So I

10   will state the proposed sentence at this time.

11        Pursuant to the Sentencing Reform Act of 1984, it is the

12   judgment of the Court -- let me just say one other thing.  You

13   did note that the acceptance of responsibility, I think that

14   is tempered by the facts noted by the Government.  First of

15   all, the mountain of evidence that he had against him; second,

16   the fact that he attempted to destroy evidence at the time of

17   his initial contact with law enforcement, and the fact that

18   the Government had to undertake international effort in order

19   to prepare the case and to obtain evidence in the case.  They

20   tempered, to some extent, his acceptance of responsibility.

21   So I believe I have addressed all the points raised by the

22   defense.  Do you agree, or are there any points you wish for

23   me to raise?

24             MR. CLEARY:  We agree, Your Honor.

25             THE COURT:  Okay.

1        So pursuant to the Sentencing Reform Act of 1984, it is

2    the judgment of the Court that the Defendant, Ricky Dean

3    Clark, is hereby committed to the custody of the Bureau of

4    Prisons to be imprisoned for a term of 240 months on each of

5    Counts I, II, XIV, XX, XXI, XXII, XXIII, XXIV, and XXV.  That

6    the Court will impose the sentence of life on Counts III, IV,

7    V, VI, and XXVI.  The Court will impose a sentence of 30 years

8    on Counts VII, VIII, IX, X, XII, XIII, XV, XVI, XVII, XVIII,

9    and XIX, and 25 years on Count XI, accepting the Government's

10    arguments on Count XI and XIV that there are mitigating

11    circumstances in terms of length that warrant a lesser

12    sentence than the statutory maximum.

13        The Court is not ordering a fine based on the Defendant's

14    current financial resources and future ability to pay.

15        If any victim requests restitution and payment is

16    ordered, it is to be made directly to the clerk of the United

17    States District Court for proportionate disbursement to the

18    victims.  The Defendant shall notify the United States

19    Attorney for this district within 30 days of any change of

20    mailing or residence address that occurs while any portion of

21    the restitution remains unpaid.

22        Any unpaid restitution balance shall be paid during the

23    term of supervision at a rate of not less than 10 percent of

24    the Defendant's gross monthly income.

25        The Defendant shall notify the probation officer of any

1    material change in economic circumstances that might affect

2    his ability to pay restitution.

3         The Court finds the Defendant does not have the ability

4    to pay interest and waives the interest requirement.

5         The Defendant shall forfeit the following items:  These

6    are items that are contained in the plea agreement on

7    page 11 — I am sorry, in Addendum B to the plea agreement,

8    and I will just incorporate Addendum B by reference.

9         Supervised release is required by statute — what did I

10   do, miss a count?  Count XXVII is 30 years.  Sorry.

11        While supervised release appears redundant, it is

12   required by statute, and the Court will impose a lifetime term

13   of supervised release per count to run concurrently.  I didn't

14   say, but all the other counts are to run concurrently as well.

15   And that is based on the Court's conclusion that Mr. Clark

16   presents a significant danger to children.

17        While on supervised release, the Defendant shall not

18   commit another federal, state, or local crime.  He shall

19   cooperate with the collection of a DNA sample.  You shall

20   refrain from any unlawful use of a controlled substance and

21   shall submit to one drug test within 15 days of placement on

22   probation and two periodic tests thereafter as directed by the

23   probation officer.

24        The Defendant shall comply with the requirements of the

25   Sex Offender Registration and Notification Act as directed by

1   the probation officer.

2        In addition, the Court is proposing to impose the

3   conditions of supervision that are contained in the

4   presentence report at Paragraphs 235 and 236.

5        Have you reviewed those conditions with Mr. Clark, Ms.

6   Beitz?

7             MS. BEITZ:  We have, Your Honor.

8             THE COURT:  Do you have any objection?

9             MS. BEITZ:  We do not.

10            THE COURT:  Mr. Clark, the probation officer has

11  listed the conditions that will govern your term of

12  supervision.  Did you review those conditions contained in

13  Paragraphs 235 and 236?

14            THE DEFENDANT:  Yeah.  Yes, ma'am.

15            THE COURT:  Do you understand them?

16            THE DEFENDANT:  Yes, ma'am.

17            THE COURT:  The probation officer also has indicated

18  why he is recommending these conditions.  That is called the

19  justification.  Did you review the justification listed there?

20            THE DEFENDANT:  Yes, ma'am.

21            THE COURT:  And do you understand why he is

22  requesting those?  Many of these are the conditions you agreed

23  to in your plea agreement; do you understand that?

24            THE DEFENDANT:  Yes, ma'am.

25            THE COURT:  All right.

1    You have the right to have me read these conditions out

2   loud right now.  If you wish me to do so I can, or if you

3   believe that you understand them, then you can waive that

4   right.  Would you like me to read them out loud?

5          THE DEFENDANT:  I waive that right, ma'am.

6          THE COURT:  The Court will accept the waiver,

7   finding that the Defendant understands the conditions, why

8   they are being imposed, and that most, if not all, are

9   contained in the plea agreement of the parties.

10    As required, the Defendant must pay the United

11   States -- to the United States a special assessment of $2,700.

12   That is due immediately and is to be made with the Clerk of

13   the United States District Court.  The Court waives any

14   additional assessment under the Justice for Victims of

15   Trafficking Act because of the Defendant's indigence.

16    Counsel, do you have any legal objection to the sentence

17   I have proposed or request any further elaboration of my

18   reasons under Section 3553(a) either as to the length of

19   imprisonment or as to the length and conditions of supervised

20   release, Ms. Korobov?

21          MS. KOROBOV:  Your Honor, I just need to -- I don't

22   think I have any objection, but did the Court say that the

23   supervised release terms were to run concurrent and the other

24   sentences were to run consecutive?

25          THE COURT:  No.

1          MS. KOROBOV:  Okay.

2          THE COURT:  Supervised release runs concurrent on

3   all counts.

4          MS. KOROBOV:  Okay.

5          THE COURT:  For life.

6          MS. KOROBOV:  There we go.  Got it.  Thank you.  No

7   objection.

8          THE COURT:  Thank you.  All right.  Ms. Beitz?  Mr.

9   Cleary?

10         MR. CLEARY:  Your Honor, we would object to the life

11  sentences imposed by the Court on the grounds that the life

12  sentence is unreasonable under the facts and circumstances and

13  under the 3553(a) factors.

14         THE COURT:  All right.  We will incorporate all of

15  the arguments that were made today, and the Court will

16  overrule that objection and impose the sentence as stated.  I

17  think there was one factor I maybe didn't mention that I will

18  mention now, and that is, the fact of providing Mr. Clark some

19  hope.  That will be something he will have to do for himself,

20  and as the Court stated, the risk of danger to children

21  outweighs any other concern that the Court would have in the

22  case.  And the Court will order the sentence imposed as

23  stated.

24         However, the Court will add recommendations as to mental

25  health treatment, sex offender treatment, programming in the

71

1   culinary arts, higher education.  The Court will recommend
2   placement in -- I know one was Tucson.
3          MR. CLEARY:  Your Honor, Mr. Clark, given the
4   sentence, would request Tucson.  That is where he will likely
5   end up.
6          THE COURT:  All right.  Tucson, Arizona.  Are there
7   any other special conditions you would like me to recommend?
8          MR. CLEARY:  No, Your Honor.
9          THE COURT:  Thank you.
10  Mr. Clark, you can appeal your guilty plea, your
11  conviction if you believe that your guilty plea was somehow
12  unlawful or involuntary or if there was some other fundamental
13  problem in the proceedings that was not waived by your guilty
14  plea; do you understand?
15         THE DEFENDANT:  Yes.
16         THE COURT:  You also have the right to appeal your
17  sentence, particularly if you think it is contrary to law; do
18  you understand?
19         THE DEFENDANT:  Yes, ma'am.
20         THE COURT:  With few exceptions, any notice of
21  appeal must be filed within 14 days of the entry of judgment.
22  If you cannot afford the filing fee or cannot afford to pay a
23  lawyer to appeal for you, the Court will appoint a lawyer to
24  represent you on appeal; do you understand?
25         THE DEFENDANT:  Yes, ma'am.

72

1      THE COURT:  Also, upon request, the Clerk of Court

2  can prepare and file a notice of appeal.  Do you have any

3  questions about your appellate rights, your appellate waiver,

4  or the time limit for filing a notice of appeal?

5      THE DEFENDANT:  No, Your Honor.

6      THE COURT:  All right.  Thank you.  Is there

7  anything further for the Government?

8      MS. KOROBOV:  No, Your Honor.

9      THE COURT:  For the Defendant?

10      MS. BEITZ:  No, Your Honor.

11      MR. CLEARY:  No, Your Honor.

12      THE COURT:  Thank you.

13      THE CLERK:  All rise.

14  (Concluded, 11:57 a.m.)

15                        – – –

16                CERTIFICATE OF COURT REPORTER

17

18      I certify that the foregoing is a true and correct copy

19  of the transcript originally filed with the clerk of court on

20  March 26, 2019, and incorporating redactions of personal

21  identifiers requested by the following attorneys of record:

22  Kristina M. Korobov, in accordance with Rule 49.1 of the

23  Federal Rules of Criminal Procedure and Southern District of

24  Indiana Rule 80-2.

25      Redacted characters appear as a black box in the

1    transcript.

2

3

4    /S/ Jean A. Knepley                    April 19, 2019
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR      Date
5    Official Court Reporter
     Southern District of Indiana
6    Indianapolis Division

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25